

# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | **UNDER SEAL** |
| | : | |
| Plaintiff, | : | No. 3:11 CV 561 (VLB) |
| | : | |
| v. | : | |
| | : | |
| JOHN DOE 1, JOHN DOE 2, JOHN | : | |
| DOE 3, JOHN DOE 4, JOHN DOE 5, | : | |
| JOHN DOE 6, JOHN DOE 7, JOHN | : | |
| DOE 8, JOHN DOE 9, JOHN DOE 10, | : | |
| JOHN DOE 11, JOHN DOE 12, AND | : | April 12, 2011 |
| JOHN DOE 13, | : | |
| | : | |
| Defendants. | : | |

## GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND OTHER ANCILLARY RELIEF

Despite occasional reports in the mainstream media,[*] the general public is largely unaware that millions of Internet users are monitored daily by criminals using "botnets." The criminals steal private personal and financial information, such as online banking credentials, and use that information to wire money from victims' bank

---

[*] **See, e.g.,** John Markoff, "A Robot Network Seeks to Enlist Your Computer," N.Y. Times, Oct. 21, 2008, at B1; Byron Acohido and Jon Swartz, "Botnet Scams Are Exploding," USA Today, Mar. 16, 2008, at B1.

accounts, to engage in identity theft, and to commit myriad other crimes.

In this suit, the United States of America ("Government") seeks a temporary restraining order and injunction under 18 U.S.C. §§ 1345 & 2521, in concert with other law enforcement activity, to prevent the Defendants from using a botnet known as the "Coreflood Botnet" to work a continuing and substantial injury on the owners and users of computers infected by Coreflood.  The Coreflood Botnet consists of command and control servers (the "Coreflood C&C Servers"), Internet domain names (the "Coreflood Domains"), and hundreds of thousands of infected computers, all described more fully below.

In order to seize the Coreflood Botnet, the Government is applying for the following relief:

*    Search warrants under Rule 41 of the Federal Rules of Criminal Procedure to seize Coreflood C&C Servers in the District of Arizona, the Northern District of Georgia, the

2

Northern District of Texas, the Southern District of Ohio, and the Central District of California;

* A forfeiture warrant under 18 U.S.C. § 981(b) to seize the Coreflood Domains in the District of Connecticut;

* A temporary restraining order, issued in the District of Connecticut pursuant to 18 U.S.C. §§ 1345 & 2521, that (i) prohibits the Defendants from using the Coreflood Botnet in furtherance of their fraudulent and other criminal activities, and (ii) gives effect to the Court's restraining order, by authorizing the Government to establish a substitute server that will respond to command and control requests from the Coreflood software on infected computers by directing the Coreflood software to stop running; and

* A trap-and-trace order, issued in the District of Connecticut pursuant to 18 U.S.C. § 3123, authorizing the substitute server to acquire the Internet Protocol ("IP") addresses of the infected computers sending command and control

3

requests to the Coreflood Domains, in order to respond with directions to the Coreflood software to stop running.

Specifically, on April 12, 2011, the Government expects to seize the Coreflood C&C Servers and the Coreflood Domain Names. The seizures will break the Defendants' hold over the infected computers for a time, but will leave hundreds of thousands of infected computers that are still running Coreflood, still surreptitiously collecting private personal and financial data, and still "beaconing" to the Internet for further instructions.

Allowing Coreflood to run unfettered on the infected computers will work a continuing and substantial injury on the owners and users of the infected computers because:  (1) the computers would be running a malicious program that the owners and users do not know about and never intended to have running; (2) the program would put at risk the privacy and confidentiality of Internet communications, including private personal and financial information, of those computer users; and (3) the program could enable the infected computers to be used in furtherance of other criminal activity,

without the knowledge of the owners or legitimate users, if the Defendants or others with criminal intent were to re-establish control over the infected computers.

Coreflood threatens the privacy and security not only of the owners of infected computers, but of third parties as well. First, Coreflood propagates quickly to other computers on a local area network. Thus, a single infected computer connected to a school's network, for example, would likely infect many other computers on the network. Second, Coreflood affects all users of an infected computer, not only the owner. This could cause widespread injury when Coreflood infects a computer in a shared environment, such as a library. Third, Coreflood is used by the Defendants to target corporate networks, which often will have private personal and financial information about customers and others in addition to information about the company itself.

To prevent that continuing and substantial injury, the Government brings this suit requesting a temporary restraining order and preliminary injunction against the Defendants, prohibiting them

5

from running Coreflood on the infected computers.  If necessary, the Government may seek such additional relief in a permanent injunction as may be required to stop the Coreflood Botnet from operating.  That is the purpose of this suit; the other, related law enforcement activities described herein are described only to provide necessary context to the Government's request.

In order to give effect to the Court's orders against the "John Doe" Defendants, the Government requests authorization to establish a substitute server -- analogous to a receivership in more traditional contexts -- that will respond to command and control requests from infected computers in the United States by instructing Coreflood to stop running.[*]  Because Coreflood configures an infected computer to run Coreflood whenever the computer is re-started, the

---

[*] This is the first case in which United States law enforcement authorities have requested authorization to control a seized botnet using a substitute command and control server.  A similar approach was taken by Dutch law enforcement authorities against the "Bredolab" botnet, in which "good" software developed by Dutch authorities was downloaded and executed on infected computers around the world as a means of victim notification.  See "Dutch Team Up With Armenia for Bredolab Botnet Take Down," N.Y. Times, Oct. 26, 2010.

substitute server will have to respond to multiple requests from Coreflood, until Coreflood can be removed from the infected computer.

The substitute server will initially be operated, under law enforcement supervision, by the Internet Systems Consortium, a non-profit entity whose mission is to promote the Internet's security and interoperability.  <u>See</u> Internet Systems Consortium, http://www.isc.org/about (last visited Apr. 5, 2011).

Even if the temporary restraining order and preliminary injunction are granted, thereby stopping Coreflood from running on infected computers, the Coreflood software will still be installed on the infected computers (just as any program may be installed on a computer even when the program is not actually running).  In order to remediate the infected computers, the Government anticipates that Microsoft will be releasing an update to its Malicious Software Removal Tool that will remove Coreflood from infected computers.[*]

---

[*]     The Malicious Software Removal Tool is referred to herein because it is free and will be updated specifically to target Coreflood. Other anti-virus programs may work equally as well.  The fact that a computer is infected by Coreflood, however, suggests that anti-virus software is not being used on the infected computer or is not being used properly.

7

The release is scheduled for April 12, 2011, the same day that the Government expects to seize the Coreflood servers and domain names, and the same day that the Government asks to have the temporary restraining order take effect.

In order to notify the owners of infected computers that they have been infected by Coreflood and that they should download and run the Malicious Software Removal Tool or other anti-virus software, the Government intends to provide the IP addresses of infected computers, obtained in accordance with the Court's trap-and-trace order, to Internet service providers ("ISPs") around the country. The Government plans  to work with ISPs to identify and notify their customers who have been infected with Coreflood, in order to avoid or minimize future fraud losses and identity theft resulting from Coreflood.

As discussed below, the Court has the authority under 18 U.S.C. § 2521 to enter a restraining order or prohibition to enjoin violations of chapter 119 of Title 18, United States Code, and to "take such other action, as is warranted to prevent a continuing and

8

substantial injury to the United States or to any person or class of persons for whose protection the action is brought."  As a result, the Court has specific statutory authority to enter an order under the facts and circumstances of this case authorizing the Government to use the Government-controlled substitute command and control server to issue commands to the Coreflood software that resides on numerous victim computers that will cause the software to stop running, at least until the computer is rebooted or restarted.  The same command will be sent to the software after each reboot of the victim computer that contains the Coreflood software because the software will restart after each reboot and will seek to reestablish contact with the command and control servers.

The Government expects that the operators of the botnet will undertake significant efforts to regain control of the botnet following the actions the Government proposes to take in this matter as set forth herein with appropriate court authorization.  Issuing the stop command to the Coreflood software will further limit the ability of the operators of the botnet to regain control of the botnet through a

variety of illegal means.  Indeed, failure to issue the stop command will increase the likelihood that the operators of the botnet will be able to successfully regain control of some part of their illicit network. Once the Coreflood software has received and executed the command to stop running, the software will also cease unlawfully collecting data from victim computers, thus preventing further violations of 18 U.S.C. § 2511 (unauthorized interception of electronic communications).

Based upon technical evaluation and testing, the Government assesses that the command sent to the Coreflood software to stop running will not cause any damage to the victim computers on which the Coreflood software is present, nor will it allow the Government to examine or copy the contents of the victim computers in any fashion.

The Government has configured all of the devices that it will use to implement the Court's orders, including the substitute command and control server and the trap and trace device, to ensure that the Government does not acquire the content of any communications as the term "content" is defined in 18 U.S.C. § 2510(8)

("'contents', when used with respect to any wire, oral, or electronic communication, includes any information concerning the substance, purport, or meaning of that communication").  Should the Government inadvertently acquire the content of any communication, it will destroy such communication upon recognition.

In addition to the requested equitable relief, the Government seeks leave to effect service of the summons and complaint under Rule 4(f)(3) of the Federal Rules of Civil Procedure. Finally, to prevent the disclosure of information, including law enforcement methods and techniques, that would jeopardize the Government's investigation in this and similar cases, the Government requests leave to file a redacted version of this memorandum and moves to seal the accompanying declaration of FBI Special Agent ("S/A") Kenneth Keller.

<u>Background</u>

**A.    The Coreflood Botnet**

As used herein, "Coreflood" refers to a malicious software program that, by some reports, has been evolving and plaguing the Internet in some form for nearly a decade.  <u>See</u> Joe Stewart, "Coreflood/AFcore Trojan Analysis" (June 30, 2008), http://www.secureworks.com/research/threats/coreflood.  Once a computer is infected with Coreflood, it can be remotely controlled from another computer, known as a command and control ("C&C") server, and used for various criminal purposes.  <u>See</u> <u>id.</u> (describing use of Coreflood to attack other computers, to provide anonymity, and to steal information for use in fraud schemes).

A computer infected by malicious software ("malware") such as Coreflood and subject to illicit and surreptitious remote control is known as a "bot," <u>i.e.,</u> a software "robot."  A group of bots under the control of one or more related C&C servers is known as a "botnet."  In this case, the Government has identified a number of related computer servers that are being used, or have been used, as

Coreflood C&C servers.  <u>See</u> Complaint ¶ 4; Declaration of Kenneth Keller, dated April 12, 2011 ("Keller Decl."), ¶ 12.  The infected computers controlled by those servers, are referred to herein as the "Coreflood Botnet."

The Coreflood Botnet is being used, among other things, to steal data from infected computers.  <u>See id.</u> ¶ 15.  The stolen data includes recorded keystrokes and Internet communications.  <u>See id.</u>  During a nearly eleven-month period, from March 2009 through January 2010, one Coreflood C&C server held approximately 190 gigabytes (GB) of data, recorded from 413,710 infected computers while unsuspecting computer users were browsing the Internet.  <u>See id.</u> ¶ 14.  The server controlled, or had previously controlled,[*] more than two million infected computers.  <u>See id.</u>

---

[*]  It can be difficult to determine the exact size of a botnet, because the size of the botnet is constantly changing as new computers are infected, disinfected by anti-virus software, and possibly reinfected.  The salient fact here is that vast quantities of data are known to have been stolen from more than 400,000 infected computers under the control of one Coreflood C&C server during an eleven-month period.  <u>See</u> Keller Decl. ¶ 14.

An example of the stolen data is provided as an exhibit to the declaration of S/A Keller.  See id. ¶ 16 & exh. A.  The stolen data shows that the user of an infected computer first accessed a MySpace account, with the user's account name and password shown on page A-3.  The user then accessed a Google mail account, with the account name and password shown on page A-4.  The user then accessed an Internet commerce site dedicated to construction equipment; the account name and password are shown on page A-9.  The user's name was displayed by the commerce site, as well as the user's approximate location, on page A-10.  Next, the user accessed an online banking account; again, both the account name and password were captured, on page A-39 and A-40.  The online banking site displayed the user's bank account number and account balance at page A-55.  Finally, the user viewed recent debit transactions, which were captured by Coreflood at pages A-58 to A-62.  Coreflood also recorded the exact dates and times that the user accessed each of the web sites and web pages.  See id.

14

The stolen data described above was encoded in 14,479 bytes; once decoded, it required 118 pages to print.  See id. ¶ 16. Extrapolating to the 190 GB of stolen data found on one Coreflood C&C server, there were more than 1.5 billion pages of stolen data on just that one server -- a stack of paper that would be over 90 miles high.

A second example of stolen data is provided as Exhibit B to the declaration of S/A Keller.  See id. ¶ 18.  The example demonstrates that Coreflood has been used to commit fraud even against a carefully secured banking account.  Specifically, the online banking account required multiple account identifiers and passwords, as shown on page B-5.  The account also used "two-factor authentication," i.e., in addition to the passwords, it required a physical token, as shown on page B-10.  Nevertheless, by monitoring the Internet communications between the user and the bank -- known as a "man in the middle" attack -- Coreflood was used to take over the online banking session after the user logged in and to then direct fraudulent wire transfers overseas.  See id. ¶ 18.

As shown in the examples, there is information from which victims can be identified -- but not easily, and in some cases, not without obtaining records from a third party such as a bank.  See id. ¶ 19.

Due to the sheer volume of data and the difficulty identifying victims, it has not been possible to determine the full extent of the fraud losses attributable to the Coreflood Botnet. Nevertheless, it has been established that the following entities were infected by Coreflood and lost money as a result of fraudulent wire transfers from their bank accounts, see id. ¶ 20:

a.    A real estate company in Michigan, from whose bank account there were fraudulent wire transfers made in a total amount of approximately $115,771;

b.    A law firm in South Carolina, from whose bank account there were fraudulent wire transfers made in a total amount of approximately $78,421;

c.    An investment company in North Carolina, from whose bank account there were fraudulent wire transfers made in a total amount of approximately $151,201; and

d.    A defense contractor in Tennessee, from whose bank account there were fraudulent wire transfers attempted in a total amount of approximately $934,528, resulting in an actual loss of approximately $241,866.

**B.    The Scheme to Defraud**

As shown above, the Defendants and their co-conspirators have committed, and are continuing to commit, wire fraud, bank fraud, and other crimes, including unauthorized interception of electronic communications.  The scheme involves the use of malicious software known as Coreflood to obtain surreptitious and unauthorized access to computers throughout the United States.  <u>See</u> Keller Decl. ¶ 48.  Once a computer is infected by Coreflood, the Defendants and their co-conspirators control it remotely through command and control servers.  <u>See</u> <u>id.</u> ¶ 24.  The Defendants and their co-conspirators use Coreflood to record keystrokes and Internet communications, including private

17

personal and financial information, of the legitimate users of the infected computers.  See id. ¶ 15.  The stolen data is sent to the Defendants and their co-conspirators, who extract online banking credentials and other information.  See id. ¶ 18.  The Defendants and their co-conspirators use that information to direct fraudulent wire transfers to themselves from the bank accounts of their victims.  See id. ¶ 20.

**C.    The Coreflood Domains**

When a computer is first infected by Coreflood, it is configured by Coreflood to run Coreflood whenever the computer starts up.  See Keller Decl. ¶ 23.  While Coreflood is running on an infected computer, it periodically contacts a command and control server for instructions, a process known as "beaconing."  See id.  The infected computer may be given various instructions, such as:  collect information about the computer and other computers on its local network; record the keystrokes and Internet communications of computer users; download and execute an arbitrary program from the Internet; or update the Coreflood software itself.  See id. ¶ 24.

18

As of April 1, 2011, the Coreflood Botnet was controlled through two command and control servers, assigned IP addresses 74.63.232.233 and 207.210.74.74.[*]  See id. ¶ 12.  Infected computers do not refer directly to the Coreflood C&C servers by IP address, but by Internet domain names such as "vaccina.medinnovation.org" and "jane.unreadmsg.net."  See id. ¶¶ 27 & 31.  The Internet domain names are translated into IP addresses using the Internet's Domain Name System ("DNS"), a publicly-available service integral to the operation of the Internet.  See id. ¶ 28.  Thus, as of April 1, 2011, the Internet domain names "jane.unreadmsg.net" and "vaccina.medinnovation.org" referenced the C&C servers assigned IP addresses 207.210.74.74 and 74.63.232.233, respectively.  See id. ¶¶ 12 & 31.

The Internet domain names used by Coreflood to refer to its C&C servers change each month.  See id. ¶ 29.  As of April 1, 2011, the

---

[*]      An IP address, or "Internet Protocol" address, is a numeric identifier used to identify computers or computer networks on the Internet.

Internet domain names that have recently been used, and are

scheduled for use, are as follows:

## C&C SERVER ASSIGNED 207.210.74.74

| Month | Primary Domain | Alternate Domain |
|---|---|---|
| 1/2011 | a-gps.vip-studions.net | old.antrexhost.com |
| 2/2011 | dru.realgoday.net | marker.antrexhost.com |
| 3/2011 | brew.fishbonetree.biz | spamblocker.antrexhost.com |
| 4/2011 | jane.unreadmsg.net | ads.antrexhost.com |
| 5/2011 | exchange.stafilocox.net | cafe.antrexhost.com |
| 6/2011 | ns1.diplodoger.com | coffeeshop.antrexhost.com |
| 7/2011 | a-gps.vip-studions.net | old.antrexhost.com |
| 8/2011 | dru.realgoday.net | marker.antrexhost.com |
| 9/2011 | brew.fishbonetree.biz | spamblocker.antrexhost.com |
| 10/2011 | jane.unreadmsg.net | ads.antrexhost.com |
| 11/2011 | exchange.stafilocox.net | cafe.antrexhost.com |
| 12/2011 | ns1.diplodoger.com | coffeeshop.antrexhost.com |

## C&C SERVER ASSIGNED 74.63.232.233

| Month | Primary Domain | Alternate Domain |
|---|---|---|
| 1/2011 | taxadvice.ehostville.com | taxfree.nethostplus.net |
| 2/2011 | ticket.hostnetline.com | accounts.nethostplus.net |
| 3/2011 | flu.medicalcarenews.org | logon.nethostplus.net |
| | | imap.nethostplus.net |
| 4/2011 | vaccina.medinnovation.org | |
| 5/2011 | ipadnews.netwebplus.net | onlinebooking.nethostplus.net |
| 6/2011 | acdsee.licensevalidate.net | imap.nethostplus.net |
| 7/2011 | wellness.hostfields.net | pop3.nethostplus.net |
| 8/2011 | savupdate.licensevalidate.net | schedules.nethostplus.net |
| 9/20111 | wiki.hostfields.net | mediastream.nethostplus.net |
| 10/2011 | taxadvice.ehostville.com | taxfree.nethostplus.net |
| 11/2011 | ticket.hostnetline.com | accounts.nethostplus.net |
| 12/2011 | flu.medicalcarenews.org | logon.nethostplus.net |
| | | imap.nethostplus.net |

(collectively, the "Coreflood Domains").  See id. ¶ 31.

A simplified diagram of the Coreflood Botnet is shown on the next page, showing two Coreflood C&C servers and the infected computers controlled by them.  The infected computers communicate with the C&C servers using built-in Coreflood Domains.  One of the bots is shown beaconing to its C&C server through the Internet domain name "vaccina.medinnovation.org," which is translated by DNS into the IP address 74.63.232.233.

The registry, registrar, and DNS provider for the Coreflood Domains (collectively, the "Domain Service Providers") are set forth in Schedule A of the Complaint, where the term "registry" refers to an entity that maintains records for a class of Internet domains, including the DNS provider for each domain; the term "registrar" refers to an entity that registers domain names with a registry and maintains records associated with those domains; and "DNS provider" refers to an entity chosen by a registrant to maintain the authoritative records used by DNS to translate an Internet domain name into an IP address. See id. ¶ 32.

21



THE COREFLOOD BOTNET

COMMAND AND CONTROL
SERVERS

74.63.232.233                              207.210.74.74

THE INTERNET

74.63.232.233

DOMAIN NAME SYSTEM ("DNS")

vaccina.medinnovation.org

VICTIM "BOTS"

Coreflood:                          Coreflood:
. . .                               . . .
Mar 2011: flu.medicalcarenews.org   Mar 2011: brew.fishbonetree.biz
Apr 2011: vaccina.medinnovation.org Apr 2011: jane.unreadmsg.net
May 2011: ipadnews.netwebplus.net   May 2011: exchange.stafilocox.net
. . .                               . . .

The Defendants used stolen or fictitious identities to register the Coreflood Domains.  See id. ¶ 35.

**D.    The Proposed Equitable Relief**

In April 2011, the Government obtained warrants to seize all known Coreflood C&C servers and the Coreflood Domains, which it expects execute on April 12, 2011.  The likely effect of the seizures will be to break the Defendants' hold over the infected computers in the Coreflood Botnet, by eliminating its command and control structure and taking control of its means of communication.  See Keller Decl. ¶ 52.

The seizures, however, will still leave hundreds of thousands of Coreflood bots running Coreflood, beaconing regularly to command and control servers that no longer exist.  See id.  Allowing Coreflood to run unfettered on the infected computers would allow Coreflood to continue recording the keystrokes and Internet communications of unsuspecting users; it would also increase the risk that the Defendants or others could regain control over the Coreflood

23

Botnet and use the infected computers again for criminal purposes.
See id. ¶¶ 55-57.

In order to mitigate the damage caused by Coreflood and to
protect the owners and users of the infected computers from further
fraud, the proposed equitable relief would order the Defendants to stop
running Coreflood on infected computers.  The Court's order would be
given effect by authorizing the Government to establish a substitute
server, operated under law enforcement supervision by the non-profit
Internet Systems Consortium, that would respond to command and
control requests from infected computers in the United States by
directing Coreflood to stop running using a command built-in to
Coreflood.  See Government's Motion for Temporary Restraining Order,
dated Apr. 12, 2011, ex. A (proposed order).  The order also permits the
Government to re-locate the substitute server, see id., which may be
necessary under certain circumstances.  See Keller Decl. ¶ 62.

The substitute server will likely have to respond to multiple
requests from each infected computer, because Coreflood configures
infected computers to run Coreflood every time the computer is turned

on or re-started.  See id.  At no time, however, will the substitute

server cause any modification to user files on an infected computer.

See id. ¶ 60.

   While the proposed temporary restraining order and

preliminary injunction are in effect, the substitute server would

effectively preserve the status quo -- i.e., that the Coreflood Botnet is

not under the control of the Defendants -- by responding to command

and control requests from infected computers in the United States by

directing Coreflood to stop running.  See Keller Decl. ¶ 62.  During that

time, the Government will make reasonable efforts to identify and

notify Coreflood victims through their Internet service providers.  The

contents of the notice will advise Coreflood victims of the Coreflood

infection, the availability of the Malicious Software Removal Tool and

other anti-virus software, and the fact that a substitute server is

responding to command and control requests by directing the

Coreflood malware to stop running.

   In addition, the contents of the notice will advise Coreflood

victims that they may "opt out" from the proposed equitable relief

without requiring any involvement by the Government or by the Court. Specifically, the owner of an infected computer who <u>wants</u> Coreflood to continue running on an infected computer need only create a file on the infected computer that overrides the DNS lookup for the Coreflood Domains.  <u>See</u> <u>id.</u> ¶ 65; <u>see, e.g.</u>, "Microsoft TCP/IP Host Name Resolution Order," Microsoft Corp., http://support.microsoft.com/kb/172218 (rev. July 2, 2010) (explaining how to use file on computer to override DNS for different Microsoft operating systems).

After a reasonable period of time, the Government will evaluate whether the Malicious Software Removal Tool and other anti-virus software has been effective in eliminating the Coreflood Botnet.  If the Coreflood Botnet continues to threaten the personal privacy and financial security of a large number of people, and if it is no longer feasible for the Government to operate the substitute command and control server, the Government may file a motion requesting additional relief against the Defendants.  <u>See</u> Keller Decl. ¶ 61.

## ARGUMENT

**I.     Jurisdiction and Venue are Proper in This Court**

Under Title 18, United States Code, Section 1345, the Government "may commence a civil action in any Federal court" to enjoin violations of specified statutes, including wire fraud and bank fraud.  Accordingly, it is clear that subject matter jurisdiction and venue are properly alleged to lie in this Court.  <u>See</u> Complaint ¶¶ 8 & 10.

In addition, for the reasons set forth below, the Court may exercise personal jurisdiction over the Defendants, who are alleged to be foreign nationals.  <u>See</u> Complaint ¶¶ 7 & 9.

**A.     The Court May Exercise Personal Jurisdiction Over the Defendants**

**1.     Applicable Law**

Under Rule 4(k)(2) of the Federal Rules of Civil Procedure, the Court may exercise personal jurisdiction over a foreign defendant to the extent permitted by the Constitution.  Specifically, the rule provides:

> **For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:**
>
> > **(A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and**
> >
> > **(B) exercising jurisdiction is consistent with the United States Constitution and laws.**

**Fed. R. Civ. P. 4(k)(2); see Dardana Ltd. v. A.O. Yuganskneftegaz and Yukos Oil Co., 317 F.3d 202, 207 (2d Cir. 2003) ("Rule 4(k)(2) confers personal jurisdiction over a defendant so long as the exercise of jurisdiction comports with the Due Process Clause of the Fifth Amendment.").**

**Due process is satisfied if:  (1) the defendant has sufficient "minimum contacts" with the forum state, such that (2) the exercise of jurisdiction would be "reasonable."  International Shoe Co. v. Washington, 326 U.S. 310, 316-17 (1945); see Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 164 (2d Cir. 2010).**

**In evaluating the defendant's contacts under Rule 4(k)(2), which treats the United States as the relevant forum, personal jurisdiction may be based on the defendant's contacts with the United States as a whole.  See Dardana, 317 F.3d at 207.  Where, as here, the**

cause of action is related to the defendant's contacts with the forum, it is sufficient if the contacts show "purposeful availment" by the defendant of an opportunity to conduct activity in the forum state. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985); see also Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 127 (2d Cir. 2002) (explaining distinction between "purposeful availment" test for purpose of specific jurisdiction and "continuous and systematic" test for purpose of general jurisdiction).

As to reasonableness, the following factors must be weighed:  "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies."  Id. (citing Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 113-14 (1987)).

At this stage, the Government is only required to make a prima facie showing of jurisdiction through allegations in the complaint.  See In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 206 (2d Cir. 2003) (per curiam); see also Mwani v. bin Laden, 417 F.3d 1, 7 (D.C. Cir. 2005).

>    2.    Having Used Servers, Registered Domain Names, and Infected Over a Million Computers in the United States, the Defendants Are Subject to Personal Jurisdiction

The Defendants' known contacts with the United States are scattered around the country.  They have used command and control servers in Texas, California, Ohio, Arizona, and Georgia.  See Keller Decl ¶¶ 43-45.  They have used domain service providers in New York, New Jersey, Pennsylvania, Massachusetts, Virginia, Florida, Arizona, Nevada, California, Oregon, and Washington.  See id. ¶ 32 & ex. C.  They have stolen money from bank accounts in Michigan, North Carolina, South Carolina, Tennessee, and probably many others.  See id. ¶ 20.  And they have infected over a million computers in the United States, including thousands of computers in Connecticut and, in all likelihood, every other state in the country.  See id. ¶ 14.

Under the circumstances, the Government respectfully submits that the Defendants are subject to personal jurisdiction in the United States under Rule 4(k)(2), as their contacts are too diffuse to subject them to the jurisdiction of any specific state's courts.[*]

The Government also believes that the "minimum contacts" test is easily satisfied, when viewing the Defendants' contacts with the United States as a whole.  Specifically, using the less stringent test that applies with respect to the exercise of specific jurisdiction, the Defendants have "purposefully availed" themselves of computer servers and domain service providers in the United States, in the course of infecting over a million computers in the United States and executing a long-running scheme to defraud in the United States.

---

[*] If, on the other hand, the Defendants' contacts are not too diffuse to satisfy the "minimum contacts" test when limited to a single state, the Government contends that jurisdiction would be proper in Connecticut, whose long-arm statute authorizes specific jurisdiction over a non-resident who "uses a computer . . . or a computer network . . . located within the state."  Conn. Gen. Stat. Ann. § 52-59b(a)(5) (West 2006); see also PDK Labs v. Friedlander, 103 F.3d 1105, 1108 (2d Cir. 1997) ("In a federal question case where a defendant resides outside the forum state, a federal court applies the forum state's personal jurisdiction rules if the federal statute does not specifically provide for national service of process.").

31

Compare Chloe, 616 F.3d at 171 (holding that "minimum contacts" test was satisfied as to employee where employee mailed counterfeit handbag to forum and company's website offered to sell handbags to customers in forum); see also Calder v. Jones, 465 U.S. 783, 788-89 (1984) (holding that specific jurisdiction existed where libel was "expressly aimed" at forum and primary "effects" were felt there).

Finally, it would be reasonable to exercise jurisdiction over the Defendants, given the very strong interest of the Government in protecting the owners and users of computers infected by Coreflood, both from financial loss as well as from being used unwittingly to commit additional crimes.

**B.   The Court Should Authorize Service of Process Under Rule 4(f)(3)**

**1.   Applicable Law**

Under Rule 4(f)(3), unless otherwise prohibited by federal law or international agreement, an individual outside the United States may be served "as the court orders."  The ordained method of service must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action" and afford

32

them an opportunity to be heard.  **Mullane v. Central Hanover Bank & Trust Co.**, 339 U.S. 306, 314 (1950) (approving notice by publication); see **Mwani**, 417 F.3d at 8 (approving notice by publication under Rule 4(f)(3)).

### 3. The Proposed Order Requires Service of Process That Satisfies Due Process

The proposed Order Authorizing Service of Process directs service by publication on the Internet and by delivery to the "last known postal and email address" provided by the Defendants when registering the Coreflood Domains.  See Government's Motion for Order Authorizing Service, dated Apr. 12, 2011, ex. A (proposed order).  The proposed Order, under the circumstances, is reasonably calculated to provide notice to the Defendants of this suit.  See Mwani, 417 F.3d at 8.

In particular, there is good cause to believe that the Defendants will attempt to obtain information about the United States Attorney's Office for the District of Connecticut and the FBI New Haven field office, the agencies primarily involved in the seizures of the Coreflood Botnet.  See Keller Decl. ¶ 57.  In doing so, the Defendants are likely to visit the publicly-available Internet sites of those agencies.  See id.

The email addresses provided by the Defendants to the registrars of the Coreflood Domains are also likely to be valid, as those

email addresses would provide the primary means of communication between the Defendants and the registrars.  See id. ¶ 38.  Accordingly, the Government believes that service of process by last-known address and email address, together with publication on the Internet, is reasonably calculated to reach the Defendants.

Notably, the proposed Order tracks the service-of-process provisions set forth in the Anticybersquatting Consumer Protection Act § 3002, 15 U.S.C. § 1125(d) (2006).  The act permits a trademark holder to sue a defendant who has registered an Internet domain name in violation of the trademark laws, a circumstance that is reasonably analogous to this suit, in which the Government is suing defendants who are using Internet domain names in furtherance of a scheme to defraud.  The act specifies, as to a defendant who cannot be found after due diligence, that service of process may be accomplished by:

> (aa) sending a notice of the alleged violation and intent to proceed under this paragraph to the registrant of the domain name at the postal and e-mail address provided by the registrant to the registrar; and
> (bb) publishing notice of the action as the court may direct promptly after filing the action.

15 U.S.C. § 1125(d)(2)(A)(ii)(II) (2006).

Because the proposed Order is reasonably calculated to give notice to the Defendants and tracks the analogous provisions of the Anticybersquatting Consumer Protection Act, the Government respectfully submits that the Court should direct service as set forth in the proposed Order Authorizing Service of Process.

## II. The Proposed Equitable Relief Is Necessary to Prevent a Continuing and Substantial Injury to Coreflood Victims

There are two statutes which authorize the proposed equitable relief here.  Under 18 U.S.C. § 1345, the Court may enjoin certain fraud offenses, including wire fraud and bank fraud.  Under 18 U.S.C. § 2521, the Court may enjoin unauthorized interception of electronic communications.  Both statutes are applicable here.

### A. Applicable Law

#### 1. Statutory Grounds for Equitable Relief

In general, district courts have "broad discretion in deciding whether to award injunctive relief."  E.g., Kapps v. Wing, 404 F.3d 105, 122 (2d Cir. 2005).  As a court of equity, the Court "may go much further both to give or to withhold relief in furtherance of the public

interest than where only private interests are involved."  Register.com,

Inc. v. Verio, Inc., 356 F.3d 393, 424 (2d Cir. 2004).

      Sections 1345 and 2521 bolster the Court's traditional

powers at equity, allowing the Court to enjoin fraudulent or illegal

conduct on a suit by the Government.  Specifically, the Government

"may commence a civil action in any Federal court to enjoin" certain

crimes, including wire fraud and bank fraud.  See 18 U.S.C.

§ 1345(a)(1) (2006); see also id. § 2521 (authorizing civil action to

enjoin unauthorized interception of electronic communications).  Both

statutes broadly authorize the court to enter an injunction or

restraining order "at any time," or to "take such other action, as is

warranted to prevent a continuing and substantial injury to the United

States or to any person or class of persons for whose protection the

action is brought."  Id. §§ 1345(b) & 2521.

      The purpose of section 1345 is "to allow the Attorney

General to put a speedy end to a fraud scheme by seeking an

injunction in federal district court as soon as the requisite evidence is

secured."  United States v. Am. Heart Research Found., Inc., 996 F.2d

7, 11 (1st Cir. 1993) (internal quotation marks omitted).  "Congress authorized this expedited action precisely because the investigation of fraudulent schemes often takes months, if not years, before the case is ready for criminal prosecution and in the meantime innocent people continue to be victimized."  Id. (internal quotation marks omitted).

Although the Second Circuit has not specifically addressed section 1345 or section 2521, it has provided guidance about similar statutory injunctions.  Most recently, in the context of a suit brought by the Securities and Exchange Commission ("SEC"), the court stated:

> The equitable standards that apply in private injunction actions are not the same as those that apply in SEC actions because the injunctions the SEC seeks are "creatures of statute."  We do not require a showing of irreparable harm for the issuance of an injunction in cases of this nature since there is a statutory sanction; instead it is enough if the statutory conditions for injunctive relief were made to appear.

City of New York v. Golden Feather Smoke Shop, Inc., 597 F.3d 115, 120 (2d Cir. 2010) (citations and internal quotation marks omitted).

Likewise, it is not necessary for the Government to show that there is no other remedy available at law.  See id. at 120-21.

40

Instead, to obtain equitable relief, the Government need only prove the alleged violation and "a reasonable likelihood that the wrong will be repeated."  Id.  Where there is a history of violations, the Court has "significant discretion to conclude that future violations of the same kind are likely."  Kapp, 404 F.3d at 122-23 ("Courts are free to assume that past misconduct is highly suggestive of the likelihood of future violations.").

  2. Prerequisites for Ex Parte Restraining Order

The purpose of a temporary restraining order is to preserve the status quo until the Court has an opportunity to pass on the merits of a preliminary injunction.  See Garcia v. Yonkers School Dist., 561 F.3d 97, 107 (2d Cir. 2009).  The Court may grant a temporary restraining order ex parte only if:

> (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
> (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b)(1).

41

**B.     The Proposed Equitable Relief Should Be Granted**

Based on the facts recited herein and set forth in the declaration of FBI Special Agent Keller, there is a reasonable likelihood that the Government can show that the Defendants are using Coreflood to commit wire fraud and bank fraud and to engage in unauthorized interception of electronic communications, as described above.

There is also a reasonable likelihood that the Government can establish a continuing and substantial injury to the owners and users of computers infected by Coreflood.  Specifically, even after the seizure of the Coreflood C&C servers and the Coreflood Domain Names:  (1) the computers will still be running a malicious program that the owners and users do not know about and never intended to have running; (2) the program will continue to put at risk the privacy and confidentiality of Internet communications, including private personal and financial information, of those computer users; and (3) the program could enable the infected computers to be used in furtherance of other criminal activity, without the knowledge of the

owners or legitimate users, if the Defendants or others with criminal intent were to re-establish control over the infected computers.  <u>See</u> Keller Decl. ¶¶ 55-57.

Finally, there is a reasonable likelihood that the Government can show that the proposed equitable relief will prevent or ameliorate the injury to the owners and users of computers infected by Coreflood.  Specifically, the temporary restraining order and preliminary injunction will stop Coreflood from running on the infected computers, thus stopping Coreflood from recording keystrokes and Internet communications.  <u>See</u> <u>id.</u> ¶¶ 58-60.  The use of a substitute command and control server to remediate infestations of Coreflood is an accepted practice in the computer security industry.  <u>See</u> Keller Decl. ¶ 62.

Accordingly, the Court should grant the temporary restraining order under 18 U.S.C. §§ 1345 & 2521, both of which empower the Court to enjoin the Defendants and to "take such other action" as may be necessary to protect, in this case, the victims of the Coreflood Botnet.  The statutory authorization for the Court to "take

such other action" is sufficiently broad to allow the relief requested,

i.e., to allow the Government to operate a substitute server that will

respond to command and control requests by instructing Coreflood to

stop running.  Without such relief, there would be no effective way to

prevent the Coreflood victims from suffering a continuing and

substantial loss of privacy and security.

      C.     **The Proposed Temporary Restraining Order
Should Be Granted Ex Parte**

The Government respectfully submits that immediate and

irreparable injury will clearly result to the Government if the proposed

temporary restraining order is not granted, in light of the risk that the

Government will not be able to prevent the Defendants from regaining

control over the Coreflood Botnet, or portions thereof, if infected

computers in the Coreflood Botnet are allowed to run Coreflood

unfettered.  See Keller Decl. ¶¶ 54-55.

In addition, as required by Rule 65, undersigned counsel

hereby certifies that no attempt has been made to serve the

Defendants, nor should such an attempt be required until on or after

April 12, 2011.  Providing notice of this suit prematurely would allow

the Defendants to preserve their control over the Coreflood Botnet

easily, by moving their command and control servers and registering

new Coreflood domain names.  See id. ¶ 57.

III.    The Proposed Equitable Relief Is Reasonable
        Under the Fourth Amendment

As explained previously, the Government initially requests a

temporary restraining order and preliminary injunction requiring the

Defendants to stop running Coreflood, together with authorization to

establish a substitute command and control server that will give effect

to the Court's orders.  The Government believes that the proposed

equitable relief is minimally intrusive and justified under the

circumstances here.

In particular, stopping Coreflood from running will not

modify any user files on the victim computers.  See Keller Decl. ¶ 60.

While the command will affect the behavior of the computer at some

level -- that is, by preventing Coreflood from beaconing to a command

and control server and by preventing it from recording keystrokes and

Internet communications -- the behavior of the computer would

unavoidably be affected anyway, as a result of the lawful seizure of the

Coreflood C&C servers and the Coreflood Domain Names.  See id. ¶ 62.

Moreover, the changed behavior is de minimis and does not interfere

with the use of the computer by the owner or other users.  Given that

the behavior of the infected computers will unavoidably be affected by

lawful law enforcement activity, the Government believes that the

appropriate course is to stop the Coreflood virus -- not to leave it

beaconing on the Internet until it can be re-acquired by the Defendants

or other malefactors.

The Government does not request, and the proposed

equitable relief does not provide, authorization for the Government to

obtain or record any data that is on the infected computers.

Accordingly, there is no cognizable "search" under the Fourth

Amendment.

Nor is there a seizure under the Fourth Amendment.  A

"seizure" of property occurs when there is "some meaningful

interference with an individual's possessory interests in that property."

United States v. Jacobsen, 466 U.S. 109, 113 (1984).  The proposed

equitable relief does not amount to a seizure, however, because it will

not meaningfully interfere with a computer owner's possessory interests over an infected computer.  See id. at 113.  Even if it were a seizure, it would be permissible without a warrant because it would have only "a de minimis impact on any protected property interest."  Id. at 125.  Finally, even if the impact were not de minimis, there is an exception to the Fourth Amendment warrant requirement that permits the proposed equitable relief.

### A.    The Seizure, If Any, Resulting From the Proposed Relief Is De Minimis

#### 1.    Applicable Law

A seizure occurs when there is a "meaningful interference with an individual's possessory interests," i.e., when the Government acts to exercise "dominion and control."  Jacobsen, 466 U.S. at 113 & 120-21; see United States v. Va Lerie, 424 F.3d 694, 702 (8th Cir. 2005) (en banc).  "Thus, the seizure standard prohibits the government's conversion of an individual's private property, as opposed to the mere technical trespass to an individual's private property."  Id. (citing United States v. Karo, 468 U.S. 705, 712-13 (1984)).

"[N]ot all police interference with an individual's property constitutes a Fourth Amendment seizure, i.e., the police do not seize property every time they handle private property.  By requiring some meaningful interference with an individual's possessory interests in property, the Supreme Court inevitably contemplated excluding inconsequential interference with an individual's possessory interests."  Id. at 706.

Even when a seizure occurs without a warrant, however, there is no Fourth Amendment violation if the seizure could, at most, "have only a de minimis impact on any protected property interest." Jacobsen, 466 U.S. at 125.

2. **The Proposed Equitable Relief Does Not Require a Warrant**

In this case, the temporary restraining order would not amount to a "meaningful interference" with any possessory interests in the infected computers.  Indeed, the proposed order is comparable to a police officer holding stolen property while waiting to return it to its rightful owner:  the Government is not making use of the infected computers and is not examining them in any way, but only returning

control of the "stolen" computer to its rightful owner.  There is no

Fourth Amendment seizure under such circumstances.

Viewed another way, the owners and users of infected

computers have no possessory interest in the operation of malicious

software that was installed without their knowledge, that was used

without their knowledge, and that could have been easily removed

without their knowledge at any time.  See Shaul v. Cherry Valley-

Springfield Cent. Sch. Dist., 363 F.3d 177, 186 (2d Cir. 2004) (holding

that teacher had no possessory interest in teaching materials

prepared by him when school actually owned materials and was

entitled to take materials at any time).  In particular, the Government

is not interfering with the operation of the infected computers at all,

except as to the Coreflood malware, and the Coreflood malware is

being controlled at present by criminals, not by the owners of the

infected computers.  Thus, the Government is not seizing the infected

computers in any way; it is, at most, seizing the Coreflood malware,

over which the owners of infected computers have no cognizable

possessory interest.

Nor, by stopping Coreflood from running, would the Government be modifying any user data on the infected machines or preventing the owners or users of the infected machines from using the machines in any other way.  See United States v. Gorshkov, No. CR00-550C, 2001 WL 1024026 (W.D. Wash. May 23, 2001) ("[T]he agents' act of copying the data on the Russian computers was not a seizure under the Fourth Amendment because it did not interfere with Defendant's or anyone else's possessory interest in the data.").

Even if the proposed restraining order amounts to a seizure, the seizure is de minimis and permissible without a warrant.  See Jacobsen, 466 U.S. at 125.  In Jacobsen, the Supreme Court considered whether the Government could conduct a destructive test on drugs that were seized without a warrant.  See id.  Even though the testing deprived the defendant of some small portion of his property, the Court concluded that the deprivation was reasonable:

> The law enforcement interests justifying the procedure were substantial; the suspicious nature of the material made it virtually certain that the substance tested was in fact contraband.  Conversely, because only a trace amount of material was involved, the loss of which appears to have gone unnoticed by respondents, and since the property had

already been lawfully detained, the "seizure" could, at most, have only a <u>de minimis</u> impact on any protected property interest.  Under these circumstances, the safeguards of a warrant would only minimally advance Fourth Amendment interests.  This warrantless "seizure" was reasonable.

<u>Id.</u> (citations omitted).

In this case, it is also "virtually certain" that the Coreflood software on infected computers is an instrumentality of crime, and also akin to contraband.  Moreover, by stopping the Coreflood software from running, the Government is not modifying the software, much less destroying it, in any way.  Finally, it is very likely that the owners of the infected computers will not even notice that the Coreflood software has stopped running, as they are very likely unaware of it to begin with.  Instead, in a sense, the Government is mitigating what amounts to be a public nuisance, one that threatens the privacy and security of the owner of an infected computer, but also others who may use the infected computer or whose computers may become infected with Coreflood.  Under all of the circumstances, the proposed restraining order is reasonable, and no warrant is required, even if the proposed restraining order effects a "seizure."

B.    **An Exception to the Fourth Amendment's Warrant Requirement Permits the Proposed Relief**

Furthermore, the requested relief is also permissible under the community caretaking exception to the Fourth Amendment's warrant requirement.

1.    **Applicable Law**

Under the "community caretaking" doctrine, a warrant is not required when law enforcement officers are engaged in "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Cady v. Dombrowski, 413 U.S. 433, 441 (1973) (holding that police officer could properly search impounded car for missing firearm without warrant); see United States v. Markland, 635 F.2d 174, 176 (2d Cir. 1980).

As always, "the ultimate measure of the constitutionality of a governmental search is 'reasonableness.'" Vernonia School Dist. 47J v. Acton, 515 U.S. 646, 652 (1995).

2.     **The Community Caretaking Doctrine Permits the Government to Stop Coreflood**

The proposed temporary restraining order amounts to "community caretaking" that would obviously be permissible under the Fourth Amendment in a more conventional setting.

For example, if a police officer responded to an anonymous tip about a break-in and observed that the front door of the residence was ajar, it would be entirely proper for the police officer to enter onto the property and "seize" the door by closing it.  Indeed, one would reasonably expect the officer to do much more.  See United States v. Quezada, 448 F.3d 1005, 1007-08 (8th Cir. 2006) (holding that community caretaking doctrine permitted police officer to enter residence and investigate where door was open under suspicious circumstances).

Here, the "anonymous tip" comes in the form of an electronic signal, sent to one of the Coreflood Domains.  The signal conclusively establishes that there has been a "break in" of a computer.  While the Government could respond by leaving the "door" to the computer open, the Fourth Amendment does not bar the

Government from taking the far more reasonable step of closing the door.  Indeed, unlike the more conventional scenario in which the police officer observed incriminating evidence after entering the residence, <u>see</u> <u>id.</u> at 1006, the Government will not observe anything at all about the infected computer.  The Fourth Amendment interest is therefore considerably lesser here than in the more conventional scenario described above.

At first blush, it may seem that the number of infected computers involved would exacerbate the Fourth Amendment issue. In fact, the opposite is true.  "The Amendment protects persons against unreasonable searches of 'their persons [and] houses' and thus indicates that <u>the Fourth Amendment is a personal right</u> that must be invoked by an individual." <u>Minnesota v. Carter</u>, 525 U.S. 83, 88 (1998) (alteration in original) (emphasis added).  Therefore, in conducting the Fourth Amendment analysis, the Court should focus on the Fourth Amendment interest of each individual computer owner, without aggregating those interests into some general and amorphous right to privacy.  Conversely, the large number of infected computers, operated

remotely by criminals overseas, adds considerable weight to the

Government's interest in stopping the Coreflood Botnet, because of

the greater damage and injury that can be caused by large numbers of

computers acting in concert.  Given the nearly incidental impact of the

requested relief on the Fourth Amendment interests of each individual

computer owner, the proposed temporary restraining order is entirely

reasonable and proper under the community caretaking doctrine.

A Second Circuit decision applying the doctrine is also

instructive.  In Markland, a Connecticut state trooper found a drink

cooler at the scene of an automobile accident on I-95 after the driver

of the automobile was taken to the hospital.  See Markland, 635 F.2d

at 175.  The trooper opened the cooler before putting it into his car,

finding stolen mail that resulted in the driver's conviction.  See id.

On appeal, the defendant argued that the warrantless

search of the cooler was improper, because there was no reason for

the trooper to open it or even to secure it:

> The personal property of an individual is a matter of his
> personal concern and its preservation and recovery the
> duty of the individual.  Should Markland have his property
> stolen by a bystander or simply lose the property, there is

**no meaningful impact on society.  It is his loss.  The
government and the public are still whole.**

**Id.** at 176 (quoting defendant's brief).

The court of appeals rejected the argument as follows:

**This argument demonstrates a curious unawareness
of a police officer's role in society.  Police have a duty to
protect both the lives and the property of citizens.  In
performing this duty, they are required to protect against
crime without waiting for it to occur.  A law-abiding citizen
of that State, hospitalized following an accident and
concerned about the security of his effects, may reasonably
expect that the police will perform what the Supreme Court
has described as their "community caretaking functions."
We need not decide whether the police could be held liable
to the hospitalized citizen for a failure to perform these
functions.  They surely would be derelict in their duty to the
public.**

**Id.** (citations omitted).  The court also reasoned that the cooler was

not the type of container that would normally contain personal effects,

unlike "a suitcase, briefcase, purse, or similar repository of personal

effects inevitably associated with the expectation of privacy."  **Id.** at

176-77 (internal quotation marks omitted).

While **Markland** involved a real highway, rather than the

"information superhighway," its import to this case is clear.  The

Government has a "duty to protect both the lives and the property of

**56**

citizens," including an obligation "to protect against crime without waiting for it to occur."  It is therefore proper, in this case, for the Government to take appropriate measures, as requested, to prevent the Coreflood Botnet from further victimizing the owners and users of the infected computers.  The Fourth Amendment interest here is also more marginal than in Markland:  few computer owners, if any, are likely to claim significant "possessory interests" in having or running malicious software on their computers, unknown to them, that is being used as an instrumentality of crime against themselves and against others.

The proposed equitable relief is also "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute," because the equitable relief is requested primarily to protect the owners and users of the infected computers.  The proposed equitable relief is not needed to effect the seizure of the Coreflood C&C servers and Coreflood Domains Names, which will be secured using search warrants and forfeiture warrants. See United States v. Miner, 956 F.2d 397, 399 (2d Cir. 1992) (applying

57

"community caretaking" doctrine where owner of property protected by Fourth Amendment was not subject of police investigation).

At bottom, the proposed equitable relief should be granted because there should be little or no Fourth Amendment protection given to malicious software -- an instrumentality of crime -- running on a victim's computer without the victim's knowledge.  The alternative -- leaving hundreds of thousands of victims exposed to fraud and identity theft -- might be considered by some to be as much a dereliction of duty as leaving an accident victim's valuables lying on the side of the road.

## IV.    A Sealing Order Should Be Entered In This Case

Pursuant to Rule 5(e) of the Local Rules of Civil Procedure, the Government respectfully requests leave to file this memorandum of law under seal, together with a redacted version as indicated herein filed publicly, for the reasons set forth herein.  The Government likewise requests leave to file the Declaration of Kenneth Keller, dated Apr. 12, 2011, under seal in order to prevent the disclosure of information that may compromise the ongoing law enforcement investigation in this case and similar law enforcement investigations in the future.

## Conclusion

For the foregoing reasons, the Government respectfully submits that the Court should:  (1) grant the proposed equitable relief, (2) direct service in accordance with the proposed Order Authorizing Service, and (3) seal the filings in this case as necessary to prevent

the disclosure of information that would jeopardize this investigation

and similar investigations in the future.

Respectfully submitted,

DAVID B. FEIN
UNITED STATES ATTORNEY

/S/ Edward Chang

By:

EDWARD CHANG (ct26472)
Assistant United States Attorney
157 Church St., 23rd floor
New Haven, CT 06510
Tel: (203)821-3796
Fax: (203)773-5373

/S/ David C. Nelson

DAVID C. NELSON (ct25640)
Assistant United States Attorney
450 Main St.
Hartford, CT 06103
Tel: (860)947-1101
Fax: (860)240-3291

60